# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Delin Qu,

                       Plaintiff,

                                     Civ. No. 08-1843 (RHK/JSM)
                                     **MEMORANDUM OPINION
AND ORDER**

v.

Board of Regents of the University of
Minnesota,

                       Defendant.

---

Delin Qu, St. Paul, Minnesota, Plaintiff *pro se*.

Jennifer L. Frisch, Associate General Counsel, University of Minnesota, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

      Plaintiff Delin Qu is a former maintenance employee at the University of Minnesota (the "University"). He commenced this action against the University[1] in June 2008, alleging that it discriminated against him during his employment on account of his race, age, and national origin, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and 42 U.S.C. § 1981 ("Section 1981"). Qu also alleges

---

[1] The caption lists the University's Board of Regents as the Defendant, but it is clear that Qu has sued the University itself. (See, e.g., Am. Compl. at 1 ("Plaintiff . . . for his complaint *against Defendant University of Minnesota*, states and alleges as follows.") (emphasis added).)

that the University retaliated against him after he complained about the alleged discrimination. The University now moves for summary judgment. For the reasons set forth below, the Court will grant the Motion.

## BACKGROUND

The record in this case, charitably speaking, is not a model of clarity. This is largely because neither party has submitted a single deposition transcript in connection with the instant Motion, something unprecedented for an employment-discrimination case in the undersigned's 17 years on the bench. Absent depositions to frame the chronology of events, the Motion has devolved into a battle of Affidavits, which are non-sequential, omit key evidence, and simply do not paint a clear picture of the facts underlying Qu's claims.

This omission is particularly noteworthy given the procedural history of this case. At a very early juncture, the University moved for summary judgment. The Court denied that Motion pursuant to Federal Rule of Civil Procedure 56(f) because Qu complained he needed time to complete discovery, *including taking depositions*. (See Doc. No. 33 ¶ 6.) Now, ten months later, the University has again moved for summary judgment, and the Court has been provided a bevy of documents and affidavits without any depositions to serve as guideposts. Despite these shortcomings, the Court, having done its best to wade through the morass, believes the relevant facts are as follows.

Qu was born in China in 1949 and earned college and law degrees there. (Qu Aff. ¶ 6.) He later emigrated to the United States and earned Master of Arts degrees in History

and Political Science from the University, as well as a Juris Doctor degree from Hamline University School of Law. (Id. ¶ 10 & Ex. 1.) He is a duly-licensed attorney in Minnesota and Illinois, as well as a member of the bar of this Court. (Id. ¶ 10 & Ex. 1.) He became a naturalized United States citizen in 1996. (Id. ¶ 10.)

While a student at the University in September 1986, Qu accepted a job as a building and grounds worker in the University's Facilities Management division ("FM"). (Frisch Aff. Ex. 1; Qu Aff. ¶ 19.) In 1994, he was promoted to Operations Supervisor. (Frisch Aff. Ex. 1; Qu Aff. ¶ 19.) In that position, he was primarily responsible for inspecting and analyzing problems with, and recommending repairs to, University facilities. (Frisch Aff. Ex. 3; Qu Aff. ¶¶ 20-21.) He also supervised ground and building workers tasked with daily maintenance of eight University buildings. (Frisch Aff. Exs. 3-4; Qu Aff. ¶¶ 20-21.)

From 2001 through 2005, Qu applied for several management-level positions with FM, from Shift Supervisor to Zone Manager to Building Service Director to Department Director. (Qu Aff. ¶¶ 27-35.)[2] In each instance, he was rejected in favor of a younger Caucasian. (Id.) There is no evidence in the record indicating that he ever complained he was passed over for these promotions because of his age, race, or national origin,

_____

[2] Qu does not explain the precise nature of these positions.

although he mentions that he generically "expressed opposition" to "unlawful employment practices" during his tenure.  (Id. ¶¶ 44-45.)[3]

Qu applied for additional FM management positions in 2006, one of which is particularly relevant here.  On September 28, 2006, Qu applied for the position of Associate Vice President of FM.  (Frisch Aff. Ex. 11.)  The University retained an independent search firm, Korn-Ferry International ("Korn-Ferry"), to review the candidates who applied for this position; the University provided Korn-Ferry with the required job qualifications, and Korn-Ferry then screened the applicants to determine whether they met those qualifications.  (Bjornberg Aff. ¶¶ 2-3.)  Qu was not selected by Korn-Ferry and, ultimately, the position went to a younger Caucasian, Mike Berthelsen, who was serving in the position on an interim basis.  (See Bjornberg Aff. ¶¶ 2-10; Frisch Aff. Ex. 13; see also Def. Mem. at 10-14.)[4]

---

[3] Sometime in 2004, Qu wrote the University's President to complain about problems within FM.  (See Qu Aff. Ex. 17.)  Those problems concerned "mismanagement" and "incompetence," although he mentioned in passing a "violation of EEO" in connection with a prior reorganization of the division and unspecified "prejudice against the . . . staff."  (See id. & Ex. 19.)  Qu concluded his letter by stating that he had "experienced discrimination based on race, age, and reverse intellectual level," but he averred that he "would rather claim these at [a] different venue if necessary."  (Id. Ex. 17.)  There is no evidence that Qu pursued those allegations in a "different venue" prior to filing a charge with the EEOC in 2007 (as discussed in more detail below).

[4] Neither party has submitted evidence from Korn-Ferry employees explaining why Qu was not selected.  However, Linda Bjornberg, the Director of Human Resources for University Services, avers that it was because he did not meet the minimum qualifications for the position.  (Bjornberg Aff. ¶ 5.)

The following February, Qu applied for several additional director-level positions with FM. (Frisch Aff. Exs. 7-9.) While those applications were pending, he was asked by FM management to participate in a pilot program targeting custodial complaints in University buildings. (Berthelsen Aff. ¶ 8 & Ex. 3.) The purpose of the pilot program was to "achiev[e] complete compliance [with] daily cleaning standards as published [by] FM." (Id. Ex. 3.) According to Qu, he was "singled out" by FM management to participate in this pilot program because of his prior complaints about FM.[5]

In response to this so-called "unfair treatment," on March 7, 2007, Qu sent a "note of concern" to the University's President (see Qu Aff. Exs. 19 & 24), and on March 21, 2007, he filed complaints with the University's Office of Conflict Resolution ("OCR") and Office of Equal Opportunity and Affirmative Action ("EOAA") (see id. Exs. 23 & 31). In the meantime, however, a University recruiter attempted to schedule an interview with him regarding his February job applications. (Qu Aff. Ex. 26.) The recruiter contacted him on several occasions, but he did not respond. (Frisch Aff. Ex. 10.) On April 12, 2007, he finally contacted the recruiter and informed her that he was withdrawing his applications in light of his then-pending complaints with OCR and EOAA. (Id.)

---

[5] Notably, the record does not support Qu's claim that he was "singled out" as the "only" supervisor to participate in the pilot program (Qu Aff. ¶ 9). Indeed, Qu's own documents indicate that another supervisor named Scott was also asked to take part in the program (see id. Ex. 20) and that Qu and Scott were chosen because more than half of the custodial complaints in 2006 came from their areas of supervision (see id. Ex. 18; see also Berthelsen Aff. ¶ 9).

According to Qu, following his complaints of being "singled out" for the pilot program, the University engaged in "a series of singling-him-out acts" designed to retaliate against him.  He claims that he was targeted for an "unusual[ly] . . . long" tour of his area of responsibility by Berthelsen; was subjected to additional scrutiny by his supervisors; and was "singled out with unprecedented non-mandatory meeting absence issue" and "singled . . . out with cancelling his scheduled annual performance review." (Qu Aff. ¶¶ 47-48, 67-71.)[6]  He filed additional complaints with the EOAA in June and July 2007 (see id. Exs. 16-1, 29), but did not believe that his complaints were being handled appropriately.  (See id. Ex. 31.)  Accordingly, he withdrew all of his internal complaints and filed a charge of discrimination with the EEOC.  He asserts that the University's retaliation escalated following his EEOC charge, including accusations that he was not adequately performing his job.  (Id. ¶¶ 74-82.)

Meanwhile, in July 2007 Berthelsen informed Qu and all other supervisory FM employees that their positions were being eliminated.  (Berthelsen Aff. ¶ 6 & Ex. 1.)  This elimination stemmed from a reorganization of the University's administrative operations, which had begun in 2004 in connection with the University's newly implemented goal of becoming one of the top three research institutions in the world.  (Id. ¶¶ 2-3.)  New supervisory positions were created in the restructured FM division, and all FM employees

---

[6] Qu frequently claims he was "singled out" in connection with so-called retaliation without explaining what he means by that phrase, and context often is no guide.  (See, e.g., Qu Aff. ¶ 68 ("Brad Hoff . . . singled me out of meeting attendance on July 3, 2007.").)

were encouraged to apply for these new positions. (Id. ¶ 6 & Ex. 1.) Qu declined to do so. When the newly created organizational structure took effect on January 1, 2008, Qu's position was eliminated and his employment was terminated, effective January 31, 2008. (Id. ¶ 7.) According to Qu, the FM reorganization was nothing more than a thinly veiled plan to terminate his employment in retaliation for his complaints. (Mem. in Opp'n at 5.)

On March 13, 2008, the EEOC issued Qu a right-to-sue letter. (Frisch Aff. Ex. 6.) This action followed.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

7

**ANALYSIS**

**I.      The Section-1981 claims will be dismissed.**

Qu seeks relief in his Amended Complaint under Title VII, the ADEA, and 42 U.S.C. § 1981.  The University argues that his claims must be dismissed insofar as they rely on Section 1981, because it enjoys immunity from suit under that statute pursuant to the Eleventh Amendment.  (Def. Mem. at 7.)  Qu has not responded to this argument, and the Court agrees with it.  See, e.g., Treleven v. Univ. of Minn., 73 F.3d 816, 818-19 (8th Cir. 1996); Sallis v. Univ. of Minn., 322 F. Supp. 2d 999, 1004 n.1 (D. Minn. 2004) (Kyle, J.) ("Because the University is an instrumentality of the State, the [plaintiff's] § 1981 claim is barred by the Eleventh Amendment.") (internal citations omitted). Accordingly, the Court will dismiss Qu's claims to the extent they rely on Section 1981.

**II.     Several of Qu's claims are barred and/or have been abandoned.**

**A.      Untimely assertions**

The crux of Qu's claims is the University's failure to promote him into several positions he sought between 2001 and 2007.  The University argues that most of these "discriminatory" failures to promote are time-barred.  (See Def. Mem. at 9 n.16; Reply at 2-5.)  The Court agrees.[7]

_____

[7] Before addressing this argument, the Court must resolve a dispute regarding the date on which Qu's EEOC charge was filed.  The University argues that the charge was filed on September 8, 2007, the date he signed the EEOC form entitled "Charge of Discrimination."  (See Def. Mem. at 14.)  Qu contends the charge was filed on August 1, 2007, the date he first contacted the EEOC and provided it with information concerning the alleged discrimination. (Mem. in Opp'n at 1; see also Qu Aff. Ex. 16-1.)  The Court will assume _arguendo_ that the earlier date is correct, because even using this date, most of the challenged failures to promote

8

Under Title VII, a claimant must file a charge of discrimination with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 769 (8th Cir. 2004). The ADEA has the same requirement. See 29 U.S.C. § 626(d)(1)(B); Dorsey v. Pinnacle Automation Co., 278 F.3d 830, 835 (8th Cir. 2002).[8] "The Supreme Court has previously determined that the . . . administrative charge period is functionally equivalent to a statute of limitations. Consequently, a claim is time-barred if it is not filed within [this] time limit[]." Wilson, 382 F.3d at 769 (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)).

Most of the promotion decisions Qu challenges here occurred more than 300 days prior to the date of his EEOC charge (August 1, 2007) – that is, before October 5, 2006. (See Qu Aff. Ex. 4.) He argues, however, that all of the promotion decisions are timely because his charge stated that discrimination had occurred from as early as November 1, 2001. (Mem. in Opp'n at 7-8.)[9] But merely listing untimely discrimination in an EEOC charge does not make it timely. See, e.g., Carter v. Wash. Metro. Area Transit Auth., 503

---

are untimely.

[8] In some instances not relevant here, the deadline for filing is 180 days. See, e.g., Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1327 (8th Cir. 1995).

[9] The EEOC charge actually states that discrimination began on November 1, 200**6**, not November 1, 200**1**. (See Qu Aff. Ex. 16-5.) Qu contends this was a scrivener's error by the EEOC and that he informed the agency that discrimination commenced in 2001. (See Mem. in Opp'n at 7; see also Qu Aff. Ex. 16-4.) The Court assumes *arguendo* that the EEOC charge should have stated November 1, 2001, and it will construe the charge as if it so stated.

F.3d 143, 145 (D.C. Cir. 2007) (limitation period "begins on the date the alleged unlawful practice occurred – not the date listed in the charge itself"); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 112 (2002) ("[D]iscrete acts falling within the statutory time period do not make timely acts that fall outside the time period.").  What matters is when the discrimination occurred *vis-a-vis* the date of the charge; any discrete act taking place more than 300 days before a charge is filed is untimely.  See 42 U.S.C. § 2000e-5(e)(1).  Here, each of the alleged failures to promote was a discrete act triggering the 300-day limitation.  See Morgan, 536 U.S. at 114 ("failure to promote" and "refusal to hire" are discrete acts triggering 300-day period).  Qu listing acts more than 300 days old in his EEOC charge was insufficient to save them.[10]

However, this is not the end of the matter.  Because the 300-day period is essentially a statute of limitations, it is subject to equitable modification on grounds of "waiver, estoppel, and equitable tolling."  Shempert v. Harwick Chem. Corp., 151 F.3d 793, 797 (8th Cir. 1998) (quoting Zipes, 455 U.S. at 393); accord, e.g., Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1327 (8th Cir. 1995).  Qu did not invoke any of these equitable doctrines in his brief, but at oral argument he asserted for the first time that the 300-day period should be modified due to equitable estoppel.  The Court does not agree.  "Under the doctrine of equitable estoppel, the party requesting the estoppel must

_____

[10] Qu cites Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970), to argue that the Court "should allow the claim[s] dated back to 2001 to proceed because th[ose earlier] claim[s] of discrimination [are] related to the allegations in" his EEOC charge.  (Mem. in Opp'n at 7.)  But Sanchez dealt with the *scope* of the conduct challenged in an EEOC charge.  Id. at 466.  It simply has no bearing on timeliness.

show that the defendant[] ha[s] engaged in affirmative conduct . . . that was designed to mislead or was unmistakably likely to mislead a plaintiff." Redman v. U.S. W. Bus. Res., Inc., 153 F.3d 691, 695 (8th Cir. 1998) (internal quotation marks omitted) (quoting Bell v. Fowler, 99 F.3d 262, 268-69 (8th Cir. 1996)); accord, e.g., Dring, 58 F.3d at 1329 (equitable estoppel applies where plaintiff is "lulled or tricked" by defendant into taking certain action). Qu claims that the application of equitable estoppel is appropriate here because (1) the University is large and well-funded while he is a lone individual of limited resources and (2) the University has a history of retaliating against employees who complained. But neither argument supports the conclusion that the University somehow *misled* or *tricked* him into delaying the filing of his EEOC charge. Ever mindful of the Supreme Court's admonition that "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants," Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1984) (*per curiam*), the Court rejects Qu's equitable-estoppel argument.

Based on the record, the only failures to promote timely challenged by Qu concern (1) the Associate Vice President position (for which Berthelsen was hired in December 2006) and (2) the District Director, Assistant District Director, and Central Services

Director positions, for which Qu applied in February 2007 but later withdrew his applications.[11]

**B.    Abandoned claims**

Although the thrust of Qu's claims is the University's promotion decisions, he also alleges in his Amended Complaint that the University discriminated against him in several other ways, including paying him less than his peers, giving him more difficult work assignments, and subjecting him to a hostile work environment.  (See Am. Compl. ¶¶ 16(c)-(d).)  But in his Opposition to the University's Motion, he does not mention this other alleged discrimination – he asserts only that the failures to promote are at issue. (See Mem. in Opp'n at 8 ("Defendant discriminated against Plaintiff if age, race/color, and national origin were motivating factors in [the University's] decisions *in not hiring Plaintiff for any and all positions above the level of operations supervisor*.") (emphasis added); id. at 9-12 (addressing only the failures to promote).)  Nor did he mention it at oral argument.  Moreover, the University has argued that certain of these claims fail because they were not mentioned in his EEOC charge (see Def. Mem. at 22-25), and Qu

---

[11] At oral argument, Qu asserted that even if some of the failures to promote were untimely and, accordingly, could not stand alone as independent claims, the Court may nevertheless consider them as background evidence of discrimination.  The Supreme Court has sanctioned that practice.  Morgan, 536 U.S. at 113 (employee may use acts beyond 300-day limitations period "as background evidence in support of a timely claim").  However, even considering the untimely failures to promote as "background evidence" of discrimination, they add little to the mix because Qu has provided almost no detail about the positions sought, the required qualifications, or the persons hired for the positions.

has not responded to that argument.  For these reasons, the Court deems abandoned the other discrimination claims mentioned in the Amended Complaint.[12]

## III.    Qu has failed to create a triable issue on his claims.

### A.    Legal framework

Claims under both Title VII and the ADEA are analyzed using the tripartite burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Recio v. Creighton Univ., 521 F.3d 934, 938 (8th Cir. 2008); Krenik, 47 F.3d at 957.  In order to survive summary judgment under McDonnell Douglas, a plaintiff must first establish a *prima facie* case, the elements of which differ for discrimination claims and retaliation claims.  In order to establish a *prima facie* case of discrimination, a plaintiff must show that (1) he belongs to a protected class, (2) he was qualified for the position he sought, (3) he suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  E.g., Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1055 (8th Cir. 2007).  In order to establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse

---

[12] Even if not abandoned, however, the Court would dismiss these claims.  For example, Qu claims that he was subjected to a hostile work environment, but he has failed to provide any evidence indicating that his working conditions were "permeated with discriminatory intimidation, ridicule, and insult."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  Indeed, he supports this claim with only one comment allegedly made by Berthelsen in September 2006, asking why he was working for FM "in light of [his] age and background" and informing him that University management called people like him "the 'old FM school.'"  (Qu Aff. ¶ 48.)  He also argues that he was paid less than other Operations Supervisors, but his evidence chart belies that assertion.  (See Qu Aff. Ex. 15.)

employment action, and (3) there exists a causal connection between the two.  E.g., King v. Hardesty, 517 F.3d 1049, 1064 (8th Cir. 2008).[13]

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. E.g., Culton v. Mo. Dep't of Corr., 515 F.3d 828, 830 (8th Cir. 2008); Elnashar, 484 F.3d at 1055.  If the defendant does so, the plaintiff must then come forward with sufficient evidence to create a genuine issue that the proffered reason is a pretext for discrimination or retaliation.  Culton, 515 F.3d at 830; Elnashar, 484 F.3d at 1055.

## B.  Qu's claims fail

### 1.  The discrimination claims

#### a.  The *prima facie* case

Qu has failed to demonstrate a *prima facie* case of discrimination with respect to all of the failures to promote he challenges.

As for the Associate Vice President position, Qu fails on McDonnell Douglas's third prong:  he has not shown that he was qualified for the position.  In fact, he has proffered no evidence at all establishing the qualifications for this position or how he met those qualifications.  Nowhere has he provided, for example, "descriptions of the duties, responsibilities, experience, knowledge, and skill required for the position."  Turner v.

---

[13] A different analysis applies when a plaintiff offers "direct evidence" of discrimination. E.g., McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 860-61 (8th Cir. 2009).  Qu does not point to any such evidence here.

Honeywell Fed. Mfg. & Techs., LLC, 336 F.3d 716, 721 (8th Cir. 2003). Nor is there any evidence that the University considered Qu qualified for the job – notably, Linda Bjornberg, the Director of Human Resources for University Services, has averred precisely the opposite. (See Bjornberg Aff. ¶ 6.) This failure is fatal to Qu's *prima facie* case. See, e.g., Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1110 (8th Cir. 1998) (plaintiff failed to establish *prima facie* case of discrimination where "[s]he offer[ed] no evidence of the qualifications necessary for the . . . position"); Anderson v. Richardson, 145 F. Supp. 2d 1131, 1139 (D.N.D. 2001) (no *prima facie* case where plaintiff "has not addressed what the qualifications for the job were").

On the other hand, the University has submitted the internal job posting for the position, listing numerous qualifications including (1) 10 years of leadership experience in facilities management, (2) a demonstrated record of change-management success, and (3) experience directing multiple projects and programs. (Third Frisch Aff. Ex. 30.)[14] Without pointing to any evidence in the record to support his assertion, Qu claims that he "possesses skills in managing and transformation at a degree no second to any of the hired personnel." (Mem. in Opp'n at 9.) But it is Qu's job, and not the Court's, to mine the record for the facts supporting his claims. See, e.g., Castro v. United States, 540 U.S.

---

[14] The University claimed that it proffered the job posting for the position with its opening brief, but in fact the University's submission related to a job in the "Capital Oversight Group." (Frisch Aff. Ex. 12.) Despite Qu calling this fact to the University's attention in his Opposition (see Mem. in Opp'n at 10-11), the University did not rectify this error until oral argument, when it (belatedly) submitted the correct job posting. Nevertheless, Qu did not submit the posting himself or otherwise provide the Court with any information concerning the qualifications for the position.

375, 386 (2003) (Scalia, J., concurring) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts . . . entitling them to relief."); Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 915 (8th Cir. 2007) ("A district court is not required to speculate on which portion of the record [a] party relies, nor is it obligated to wade through and search the entire record for some specific fact that might support th[at] party's claim.") (citation omitted).  The University asserts, and the Court agrees, that nothing in Qu's background or experience suggests that he had extensive change-management skills – something obviously important for a managerial position in a division undergoing a complete restructuring – or experience leading multiple projects or programs.  Simply put, Qu has offered nothing more than his own conclusory allegation that he was qualified.  That is not enough.  E.g., Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1047 (8th Cir. 2005) (plaintiff's "conclusory allegations" that she was qualified were "insufficient to satisfy a *prima facie* case").

As for the positions Qu sought in February 2007, there is no dispute that he withdrew his applications for those positions, even after the University had expressed interest in interviewing him.  (See Qu Aff. ¶ 62.)  An individual who voluntarily withdraws an application for a promotion cannot state a *prima facie* case of discrimination.  Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 762-63 (4th Cir. 1998); rev'd on other grounds, 527 U.S. 1031 (1999); Trainor v. SBC Servs., Inc., No. 04 C 779, 2006 WL 644483, at *5 (N.D. Ill. Mar. 7, 2006); Sanchez v. Univ. of Conn. Health Care,

292 F. Supp. 2d 385, 394 (D. Conn. 2003); <u>Dillard v. Chi. Transit Auth.</u>, No. 00 C 8028, 2003 WL 22136309, at *3 (N.D. Ill. Sept. 16, 2003); <u>Collette v. St. Luke's Roosevelt Hosp.</u>, No. 99 Civ. 4864, 2002 WL 31159103, at *9 (S.D.N.Y. Sept. 26, 2002). While the withdrawal of an employment application might not undermine a plaintiff's *prima facie* case if his application would have been futile, <u>see</u> <u>Lowery</u>, 158 F.3d at 763, Qu nowhere argues futility here. Rather, he contends that he had "no choice" but to withdraw his applications because it would have been "harder for FM to fire me from a position I h[e]ld for over 13 years with [an] impeccable record" than it would be to fire him from a new position. (Qu Aff. ¶ 62.) Qu's concern about his job security does not demonstrate that it was futile for him to apply for promotions in February 2007.[15]

### b. Pretext

Even if Qu had demonstrated a *prima facie* case of discrimination with respect to the Associate Vice President position and the District Director, Assistant District Director, and Central Services Director positions, his claims would still fail because he cannot demonstrate that the University's proffered reasons for failing to promote him (he was not qualified for the positions and more qualified candidates were selected) are pretextual.

---

[15] At oral argument, Qu suggested that even if he had not withdrawn his applications, the University would have discriminatorily rejected them. Such supposition or surmise is insufficient to demonstrate futility, <u>see</u> <u>Beveridge v. Nw. Airlines, Inc.</u>, 259 F. Supp. 2d 838, 854 (D. Minn. 2003) (Erickson, M.J.), particularly given that the University had expressed interest in interviewing Qu before he withdrew the applications.

The crux of Qu's pretext argument is that he was more qualified than all of the persons selected for the positions. This is a running theme throughout his brief – he repeatedly asserts that "[t]he essence of the instant case is that Plaintiff not only possesses the highest academic credential[s] [of] anyone in the FM [division], but also possesses years of internal experience with an impeccable service record, and external managerial experience as well." (Mem. in Opp'n at 11.) But "differences in qualifications between job candidates are generally not probative evidence of discrimination unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons . . . that the plaintiff was clearly better qualified for the position at issue." Millbrook v. IBP, Inc., 280 F.3d 1169, 1179 (7th Cir. 2002) (quoting Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 279 (5th Cir. 1999)).

Here, Qu has not performed a comparison between his qualifications and those of the persons selected. Indeed, he has provided only minimal information (such as length of employment) about the qualifications of those individuals. (See Qu Aff. Ex. 4.) Instead, he posits that he was more qualified than anyone else because he was the "most educated" person in FM, pointing to his Master's degrees (in history and political science) and his law degree. (See Mem. in Opp'n at 9-11.) Yet, he has offered no explanation why those degrees in any way rendered him more qualified for the positions he sought. (See Mem. in Opp'n at 9 (baldly asserting that his "professional licenses fit him [for] all of the positions").) While extensive education is commendable, it does not necessarily render a person more qualified than other applicants, see Horton v. Univ. of N.D., No.

18

2:04-CV-110, 2006 WL 267147, at \*3 (D.N.D. Jan. 9, 2006) ("[P]ossessing a higher education degree does not prove that one is more qualified."), particularly where the degrees have no obvious connection to the positions sought.

Nor has Qu shown that his years with FM rendered him qualified for a managerial position. Indeed, it is unclear from the record that the tasks he performed as an Operations Supervisor involved job duties having any substantial connection to the higher positions he sought. He seems to have conflated years of service with qualifications, but "greater experience alone will not suffice to raise a fact question as to whether one person is clearly more qualified than another." Nichols v. Loral Vought Sys. Corp., 81 F.3d 38, 42 (5th Cir. 1996); accord, e.g., Higgins v. Tyson Foods, Inc., 196 Fed. Appx. 781, 784 (11th Cir. 2006) ("Plaintiff's argument is in essence that, since she had seniority, she was entitled to the job. That is not the measure."); Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 959 (5th Cir. 1993) (rejecting as unpersuasive plaintiff's "attempt to equate years served with superior qualifications").

At bottom, Qu's argument boils down to his subjective belief that he was the most qualified person for the positions he sought. This is insufficient as a matter of law to establish pretext. See, e.g., Curby v. Solutia, Inc., 351 F.3d 868, 874 (8th Cir. 2003) (plaintiff's "subjective opinions regarding her own qualifications are not evidence of pretext").

### 2. The retaliation claims

Qu asserts that he endured "a series" of retaliatory acts beginning in 2001, including *inter alia* all of the challenged failures to promote. (Mem. in Opp'n at 13.) But for the reasons set forth above (see supra at 8-12), only acts occurring on or after October 5, 2006, are actionable. Hence, Qu's retaliation claims are limited to: (1) his failure to obtain the Associate Vice President position and the District Director, Assistant District Director, and Central Services Director positions; (2) the "increased scrutiny" and "singl[ing] out" incidents following his March 2007 discrimination complaints; and (3) the termination of his employment. None of those claims passes muster.

### a. The "increased scrutiny" and "singling out"

Taking the second category first, Qu claims that the University retaliated against him by, among other things, asking him to participate in the pilot program, "singl[ing] him out" for a 5-hour tour of his area of responsibility, canceling his annual performance review, and "fraudulently" asserting that his performance was deficient and reporting that "deficiency" to upper levels of management. (See Mem. in Opp'n at 4-5.) But in order to establish a *prima facie* case of retaliation with respect to these incidents, he must show that they constituted "materially adverse actions." E.g., Hervey v. County of Koochiching, 527 F.3d 711, 722 (8th Cir. 2008). The Supreme Court recently clarified that an action is "materially adverse" only if it "would have 'dissuaded a reasonable worker from making or supporting a claim of discrimination.'" Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). It is *material* adversity that matters because the nation's employment laws are not concerned with "trivial harms."

Burlington N., 548 U.S. at 67-68 (anti-retaliation provisions "protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm"; "normally petty slights, minor annoyances, and simple lack of good manners" are insufficient).

Here, even assuming that all of the aforementioned acts occurred under circumstances giving rise to an inference of retaliation, the Court concludes that they are not actionable because they are not materially adverse employment actions. Qu nowhere suggests that these incidents, whether viewed individually or collectively, were used as a basis to lower his salary, reduce his benefits, or terminate his employment. See, e.g., Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785-86 (8th Cir. 2007) (negative reports from supervisor and unfair discipline insufficient absent evidence of actual harm); Forest v. Barnes-Jewish Hosp., No. 4:04CV686, 2006 WL 1300611, at *7 (E.D. Mo. May 10, 2006) ("Increased scrutiny and formal criticisms, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions.") (citations omitted). While he may have been accused of shoddy work, an "unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000); accord, e.g., Littleton v. Pilot Travel Ctrs., LLC, 568 F.3d 641, 644 (8th Cir. 2009) ("sending a critical letter that threatened 'appropriate disciplinary action'" and "falsely reporting poor performance" do not amount to retaliation "absent showings of materially adverse consequences to the employee"). There exists no such evidence in

the record here.  Similarly, Qu's participation in the pilot program and his reassignment shortly before the termination of his employment are not materially adverse employment actions, as he has offered no evidence of a "considerable downward shift in skill level required to perform h[is] new job responsibilities."  Meyers v. Neb. Health & Human Servs., 324 F.3d 655, 659 (8th Cir. 2003); accord, e.g., Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007) ("Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the [materially adverse] prong.").

Simply stated, none of this so-called "retaliation" is sufficient "to meet the significant harm standard set forth in Burlington Northern."  Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 929 (8th Cir. 2007) (failure to provide training and orientation, denying access to needed employment tools, interfering with plaintiff's authority, unfairly adding negative reports and reprimands to plaintiff's personnel file, excluding plaintiff from meetings, and giving her a negative evaluation all insufficient to constitute adverse actions); accord, e.g., Littleton, 568 F.3d at 644; Devin, 491 F.3d at 785-87.

### b.    The remaining "retaliation"

As for the other alleged acts of retaliation, the Court need not linger long.

*First*, the record simply does not support Qu's assertion that he failed to obtain the Associate Vice President position or the positions he sought in February 2007 due to retaliation.  With regard to the former, there is no demonstrable temporal link between any of Qu's complaints and his failure to obtain the Associate Vice President position.

Nor is there any evidence that the Korn-Ferry decision-makers were aware of Qu's prior complaints, or any other evidence in the record demonstrating a "causal nexus" between his complaints and the failure to promote. Accordingly, he cannot state even a *prima facie* case of retaliation. As for the latter, although Qu was denied the positions shortly after he complained to OCR and EOAA, he has failed to proffer evidence rebutting the University's reason for denying those promotions: his withdrawal of his applications. Nor is it reasonable to conclude that the University retaliated against him by denying him these positions when it had expressed an interested in interviewing him for them.

*Second*, the Court finds no triable issue with respect to the termination of Qu's employment. It is undisputed that the University phased out all FM jobs as part of its restructuring, and it embarked on that course in 2004, well before Qu's documented complaints. (Berthelsen Aff. ¶¶ 2–7.) Moreover, it is equally undisputed that Qu and all other FM employees were encouraged to apply for positions in the newly restructured FM division. (Id. ¶ 6 & Ex. 1.) These facts undermine any retaliatory animus. See, e.g., Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 549-51 (4th Cir. 2006) (retaliation claim failed where evidence showed employer considered eliminating plaintiff's job before his protected activity and encouraged plaintiff to apply for other positions with company); Bartges v. Univ. of N.C. at Charlotte, 908 F. Supp. 1312, 1330 (W.D.N.C. 1995) (no retaliatory failure to promote where plaintiff, *inter alia*, was "invited to apply for the position"). Furthermore, Qu has failed to point to any evidence that the persons responsible for the FM restructuring were aware of his prior complaints. See Littleton,

568 F.3d at 645 (no inference of discrimination where decision-makers unaware of protected activity).  Under these circumstances, Qu has not proffered sufficient evidence to create a genuine issue of material fact with regard to retaliation.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 40) is **GRANTED** and Plaintiff's Amended Complaint (Doc. No. 4) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: September 2, 2009                        s/Richard H. Kyle
                                                RICHARD H. KYLE
                                                United States District Judge